UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JACQUELINE T. BARTOLOME,                )
        Plaintiff,                      )
                              )
                              )     No. 1:09-cv-00712
-v-                                     )
                              )     HONORABLE PAUL L. MALONEY
COMMISSIONER OF SOCIAL SECURITY,        )
        Defendant.                      )
_____)

## OPINION AND ORDER REJECTING IN PART
## REPORT AND RECOMMENDATION
## AND REMANDING TO COMMISSIONER

Before this court is a Report and Recommendation issued by Magistrate Judge Scoville (ECF No. 11) recommending that the court affirm Defendant's decision to deny Plaintiff Jacqueline Bartolome's claim for disability insurance benefits. Ms. Bartolome objects to the magistrate judge's recommendation, arguing that (1) the decision improperly rejected the opinion of Dr. Braman, one of her treating doctors; (2) the decision erroneously failed to include Ms. Bartolome's psychological limitations in a hypothetical question to the vocational expert regarding job opportunities for a person similar to Ms. Bartolome; and (3) the decision erroneously found that Ms. Bartolome's testimony was not credible.

For the reasons discussed below, I find that the ALJ's opinion did not provide adequate explanation to allow the court to meaningfully review the ALJ's decision to reject Dr. Braman's medical opinion. I therefore must reject the Report and Recommendation and remand to the Commissioner for further proceedings.

## I.    BACKGROUND

In August of 2000, Plaintiff Jacqueline Bartolome had part of her thyroid gland surgically removed as a result of a goiter that had not responded to other treatments. After the surgery, her

vocal cords became partially paralyzed and fixed very close together, causing Ms. Bartolome breathing trouble and making it difficult for her to speak.  This in turn makes her continually short of breath, which makes physical activity difficult.  Ms. Bartolome also has trouble sleeping because of her breathing problems, and she was only able to speak quietly and with frequent pauses for breathing.  Ms. Bartolome, who worked as a customer-service representative in a call center, underwent treatment to try to fix these problems, but met with only limited success.  In August 2002, Ms. Bartolome underwent more surgery, a microlaryngoscopy with transverse cordotomy, which improved her breathing and voice somewhat.  After this surgery, Dr. Bastian, a specialist in voice, swallowing, and airway disorders with the Voice Institute who had been treating Ms. Bartolome, limited Ms. Bartolome to four days of work per week.  He only removed this restriction in January 2006.  (A.R. 615.)  During this time, Ms. Bartolome continued to work as a customer-service representative, though her vocal and breathing problems continued.

These problems led Ms. Bartolome to apply for disability benefits on March 17, 2006.  After her claim was initially denied, she requested a hearing, which took place on November 5, 2008.  During this time, Ms. Bartolome saw several doctors, whose records and statements constitute much of the record at issue in this case.  On the day Ms. Bartolome applied for disability, Dr. Frank Hernandez reported that her voice was hoarse and she had trouble breathing while talking, though he declined to opine on whether she was disabled.  (A.R. 521.)  In June of 2006, Ms. Bartolome saw Dr. Dennis Mulder, a psychologist, at the request of the Social Security Administration.  (A.R. 567–71.)  Dr. Mulder diagnosed Ms. Bartolome as suffering from "panic disorder without agoraphobia, secondary to physical complaints"; "depressive disorder NOS"; and "psychological factors affecting physical condition."  (*Id.*)  He reported that Ms. Bartolome was "in contact with

2

reality[,] cooperative and generally pleasant" and that she appeared "oriented, alert, and generally nonspontaneous." (*Id.*) Her "speech was clear, coherent, and fluent but occasionally she would breathe with a rasping sound. Her thought processes were relevant, logical, and connected." (*Id.*) Dr. Mulder concluded that Ms. Bartolome had a "fair" chance of "becoming gainfully employed in a simple, unskilled work situation," though she "may benefit from a vocational rehabilitation program to help her explore work activities that do not involve vocalization or extensive physical exertion." (*Id.*) Dr. Mulder gave Ms. Bartolome a Global Assessment of Functioning score of 55, corresponding to moderate symptoms. (*Id.*)

Ms. Bartolome continued to see her specialist, Dr. Bastian, who reported on March 6, 2006 that her breathing was noisy, which "impacts in social circumstances and the work place." (A.R. 617.) Ms. Bartolome's difficulty in breathing "makes her essentially sedentary of necessity," because "if she tries to move around and be active to any significant degree at all, her breathing becomes even worse." He described her voice as "very weakened," and he opined that she "could not possibly compete against background noise." (*Id.*) In January 2007, Dr. Bastian similarly stated that Ms. Bartolome's voice was soft and weak, could be heard only in quiet surroundings, and could not be sustained, though she did not need the assistance of a device to speak. (A.R. 598–99.) Dr. Bastian answered a "rest questionnaire" asking his opinion about the minimum amount of rest periods that Ms. Bartolome would require if she returned to work. Dr. Bastian chose the "other" option, and explained that "[t]he issue isn't so much rest—[Ms. Bartolome] has very limited voice AND limited airway. [She c]annot do anything very active without becoming short of breath." (*Id.*)

Ms. Bartolome also saw Dr. Marie McKay, a psychiatrist, 6–10 times between September 2007 and April 2008. Dr. McKay filled out several questionnaires and wrote a two-page letter

regarding Ms. Bartolome's problems. In these materials, she described Ms. Bartolome's adjustment disorder and "recommend[ed] without reservation that she be considered disabled." (A.R. 667–68.) Dr. McKay concluded that Ms. Bartolome "had a poor to no ability to deal with the public and deal with work stresses," "a fair to poor ability to follow work rules and relate to co-workers," "a fair ability to interact with supervisors, function independently, maintain attention/concentration, deal with changes in a work setting, and understand, remember and carry out any type of instructions"; "a good ability to maintain personal appearance, behave in an emotionally stable manner and relate predictably in social situations"; and "an unlimited ability to use judgment." (A.R. 18 (ALJ's summary of Dr. McKay's conclusions); *see* A.R. 669–70.) Dr. McKay based these conclusions on her sessions with Ms. Bartolome, as well as Ms. Bartolome's "self-report[ing]." (A.R. 669–70.) She explained that while Ms. Bartolome has no cognitive or intellectual limitations, "her physical impairments do have psychological consequences." (A.R. 668.) Dr. McKay noted that Ms. Bartolome experiences "a great deal of anxiety" regarding transportation, out of a fear that she would not be able to communicate with others in an emergency. (A.R. 667.) Ms. Bartolome's communication difficulties and physical limitations would put her under "severe distress" in a workplace, Dr. McKay opined, and it would be "incredibly unrealistic" for a workplace to accommodate Ms. Bartolome's communications problems. (A.R. 667–68.) Dr. McKay also filled out a questionnaire regarding Ms. Bartolome's functional limitations, concluding that she suffered from "Marked" restriction of the activities of daily living, "Marked" difficulties in maintaining social functioning, "Extreme" difficulties maintaining concentration, persistence, or pace, and that she has had "Four or more" extended episodes of decompensation. (A.R. 672–73.)

Ms. Bartolome also presented medical records and statements from Dr. Paul Braman, another

treating doctor.  On July 10, 2008, Dr. Braman filled out several questionnaires regarding Ms. Bartolome's condition, including an "organic loss of speech" questionnaire, the "rest questionnaire" that Dr. Bastian had also filled out, and an "exertional limitation questionnaire."  (A.R. 662–65.) On the first form, Dr. Braman agreed that Ms. Bartolome was "able to produce speech, but difficult to understand," that her speech could not be maintained, and that this impairment would "interfere with the patient's ability to communicate in a work-like setting."  (A.R. 663.)  On the rest questionnaire, he checked the option stating that "patient requires complete freedom to rest frequently without restrictions."  (A.R. 664.)  And on the exertional limitation questionnaire, Dr. Braman rejected the option for "sedentary work," instead marking the option stating that "patient is incapable of sedentary work on a sustained and full-time basis."  (A.R. 665.)  Dr. Braman did not include comments on these forms to explain his choices.

At the hearing, which lasted for approximately an hour, the ALJ found that Ms. Bartolome spoke in complete sentences and that her speech was "easily understood," though she sometimes "wheezed on inspiration."  (A.R. 21.)  At the hearing, and in other documentation submitted to the ALJ, Ms. Bartolome stated that she could do light household chores and that she left her home approximately once or twice a week. (*See* A.R. 21.)  A vocational expert ("VE") attended the hearing and was questioned regarding jobs available in the area that could be performed by a person with various limitations.  As relevant to the issues currently before this court, the ALJ asked the VE to assume a hypothetical person of the same age and  education and Ms. Bartolome, and with the same work experience, who was "limited as follows":

> Limited to lifting 10 pounds occasionally and less than 10 pounds
> frequently.  Able to stand and walk for about two hours out of an
> eight-hour day and can sit for about six out of eight hours, with no
> climbing of ladders, ropes, or scaffolds.  Can occasionally climb

> ramps and stairs.  Can frequently balance and occasionally use all of
> the different postural movements.  The person's speech is limited by
> weakness of speech or vocal weakness, limited to short sentences and
> very quiet environments with no background noises.  Must avoid
> even moderate exposure to fumes, odors, gas, and also to unprotected
> heights.  Must avoid concentrated exposure to extreme cold and heat.

(A.R. 59.)  The vocational expert testified that such a hypothetical person would be able to perform

several different jobs in the region, including billing or payroll clerk, general office clerk, production

inspector, and packager.  (A.R. 59–62.)

The ALJ issued an opinion on December 30, 2008, explaining his decision that Ms.

Bartolome was not disabled.  (A.R. 22–23.)  The ALJ found that Ms. Bartolome suffered from a

number of "severe" impairments: "status post subtotal thyroidectomy . . . with vocal cord and fold

impairment (paralysis) with weak speech volume; sleep apnea; and adjustment disorder with panic

attacks."  (A.R. 14.)  Though these impairments meant that Ms. Bartolome had a number of

limitations, the ALJ found that she retained the residual functional capacity to perform sedentary

work

> lifting/carrying ten pounds occasionally; standing/walking up to two
> hours in an eight-hour workday; sitting up to six hours in an eight-
> hour workday; never climbing ropes, ladders or scaffolds;
> occasionally climbing ramps and stairs; frequently balancing; and
> occasionally stooping, kneeling, bending, twisting, crouching and
> crawling. The claimant is limited to speaking only short sentences in
> quiet environments; and needs to avoid moderate exposure to fumes,
> odors, gases and unprotected heights; and avoid concentrated
> exposure to temperature extremes.

(A.R. 20.)  Though Ms. Bartolome was not able to continue her past employment, the ALJ

found—relying largely on the VE's testimony—that she could perform other jobs consistent with

her residual functional capacity.  (A.R. 22–23.)  Therefore, she was not disabled under the Social

Security Act.  (A.R. 23.)

In coming to his decision, the ALJ considered the various medical opinions in the record and expressly declined to follow the opinions of Dr. Braman and Dr. McKay.  Regarding Dr. Braman, the ALJ stated, "The undersigned does not accord controlling weight to [Dr. Braman's] assessment because the medical records do not support the conclusion that the claimant could not perform at least simple sedentary work on a full time regular basis."  (A.R. 17.)  The ALJ also "d[id] not give great weight to the opinion of Dr. McKay," but for somewhat different reasons.  (A.R. 18.)  Dr. McKay saw Ms. Bartolome "only six to ten times in an eight month period, and gave her opinion several months after last seeing the claimant."  (A.R. 18.)  Further, "[t]here is no evidence to support findings that the claimant cannot follow work rules, relate to co-workers, deal with work stress, interact with supervisors, function independently, maintain attention/concentration, deal with changes in a work setting, or understand, remember and carry out instructions."  (A.R. 18.)  The ALJ pointed to the fact that "the claimant worked for six years after her impairment resulting surgery; and is able to function independently, relate well to friends and family, handle her own finances, leave home alone, drive, do minor household chores, and go shopping."  (A.R. 18.)

The ALJ also concluded that Ms. Bartolome's testimony was not entirely credible.  Noting Ms. Bartolome's statements about her day-to-day activities, her testimony at the hearing, her past job history, and the opinions of Drs. Bastian, Hernandez, Mulder, and Braman, the ALJ discounted her statements "concerning the intensity, persistence and functionally limiting effects of these symptoms" to the extent that they conflicted with his residual functional capacity determination. (A.R. 20–21.)

The Appeals Council denied review of the ALJ's decision on June 25, 2009, upon which the ALJ's decision became a final decision of the Commissioner.  On August 3, 2009, Ms. Bartolome

filed the present action under 42 U.S.C. § 405(g), seeking review of the Commissioner's decision. Following briefing, Magistrate Judge Scoville issued a Report and Recommendation ("R&R") (ECF No. 11) that the Commissioner's decision be affirmed. Ms. Bartolome timely filed objections to the R&R (ECF No. 12), and the Commissioner has filed a response (ECF No. 15) pursuant to this court's order.

## II.   STANDARD OF REVIEW

Parties have 14 days to file written objections to the proposed findings and recommendations in a magistrate judge's report and recommendation ("R&R").  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  A district court judge reviews *de novo* the portions of the R&R to which objections have been filed, and may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Only specific objections are entitled to *de novo* review under the statute, *see Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986) (per curiam), and the statute does not "positively require[] some lesser review by the district court when no objections are filed."  *Thomas v. Arn*, 474 U.S. 140, 150 (1985).  Failure to object to an issue waives that issue, along with the party's right to appeal that issue.  *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005); *see Arn*, 474 U.S. at 155 (upholding the Sixth Circuit's practice).

"This court's review of the Commissioner's decision is limited to determining whether it is supported by substantial evidence and was made pursuant to proper legal standards."  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is "more than a scintilla but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994).  So long as the Commissioner's decision is supported by substantial

evidence, this court must affirm, even if substantial evidence also supports the opposite conclusion and even if the court would have decided the matter differently.  *See Smith v. Chater*, 99 F.3d 780, 781–82 (6th Cir. 1996).

## III.  DISCUSSION

Ms. Bartolome objects to the magistrate judge's R&R on a number of points, each containing multiple sub-arguments.   For clarity, I will group these objections into three main grounds.  First, Ms. Bartolome argues that the ALJ failed to give sufficient deference to the opinion of Dr. Braman, one of her treating doctors.   Second, she argues that the ALJ also failed to defer to her treating psychiatrist, Dr. McKay, and that the ALJ therefore erred by ignoring Ms. Bartolome's psychological limitations when he asked the vocational expert to evaluate the job opportunities for a hypothetical person having limitations similar to Ms. Bartolome's.   Third, Ms. Bartolome argues that the ALJ improperly found that her testimony was not credible.  She argues that the magistrate judge made each of the same errors or failed to correct the ALJ's errors.

I will address each of these grounds in turn.

### A.      *The ALJ's Deference to Dr. Braman*

Plaintiff objects that the ALJ and magistrate erred by failing to give sufficient deference to the opinions of her general practitioner, Dr. Braman.  She makes three arguments in support of this objection: first that the ALJ's opinion was improperly vague; second that the ALJ erroneously found that Dr. Braman's opinions were inconsistent with the opinions of Dr. Bastian, Plaintiff's treating specialist; and third that the ALJ was not allowed to reject Dr. Braman's "sufficiently supported" opinion.

Ms. Bartolome's arguments are based on the regulation governing how the agency will

9

handle medical opinion evidence, 20 C.F.R. § 404.1527(d), commonly known as the "treating physician rule."  This regulation states, "If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight."  *Id.* at 404.1527(d)(2).  Such an opinion is only controlling as to the "nature and severity of [the applicant's] impairment(s)," however, not as to the questions of whether the applicant is disabled and the extent of her residual functional capacity. These latter questions are reserved for the Commissioner, and a doctor's opinion on those topics is not entitled to any special significance.  *See* 20 C.F.R. § 404.1527(e); *Bass v. McMahon*, 499 F.3d 506, 511 (6th Cir. 2007).

Where an ALJ decides that the treating doctor's opinion does not control, he must determine how much weight to give that opinion, in light of several factors: the length of the treatment relationship and frequency of examination; the nature and extent of the treatment relationship; the evidence supporting that opinion; the opinion's consistency with the record as a whole; and the treating doctor's area of specialization.  20 C.F.R. § 404.1527(d).  Regardless, in any case, the ALJ "will always give good reasons in [his] notice of determination or decision for the weight [given to the] treating source's opinion."  *Id.* § 404.1527(d)(2).  Social Security Ruling 96-2p further explains that "the notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record."  Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5.  The decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.*

10

It is this explanation requirement which Ms. Bartolome first argues the ALJ violated.  The ALJ reported that in July of 2008, Dr. Braman reported that Ms. Bartolome "could not sustain speech, and could be barely heard." (A.R. 17.)  Dr. Braman "reported that the claimant would need complete freedom to rest frequently without restriction, and was incapable of even sedentary work on a sustained and full time basis." (*Id.*)  The ALJ, however, "d[id] not accord controlling weight" to Dr. Braman's opinion, "because the medical records do not support the conclusion that the claimant could not perform at least simple sedentary work on a full time regular basis." (*Id.*)  The ALJ did not cite any particular medical records in this discussion.

Ms. Bartolome argues that this discussion was too vague to satisfy the regulation.  The courts of this Circuit do reject ALJ decisions that fail to give "good reasons" for giving a treating doctor's opinion less than controlling weight.  *See, e.g.*, *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).  While this rule is clear in some contexts, such as where the ALJ's decision entirely fails to mention a treating physician, *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007), its application here is less than obvious.

The Sixth Circuit has held, in a situation rather similar to this one, that an ALJ did not provide "good reasons" by stating only that "[o]nce again, in assessing the evidence in light of Section 404.1527 of the Social Security Administration Regulations No. 4, the record does not support the limitations of the severity suggested by" the treating doctor.  *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245–46 (6th Cir. 2007) (internal quotation marks omitted; alteration in original).  The *Rogers* panel rejected the ALJ's decision, finding that merely citing to "the evidence" and referring to the appropriate regulation "failed to provide sufficient justification for the weight given to the opinions of Rogers' treating physicians." *Id.* at 246.  Another panel, however, has upheld an

ALJ decision using similar language. *See Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 877 (6th Cir. 2007). The ALJ decision at issue in *Smith* "declined to give Barber's and Griner's opinions controlling weight, specifically stating that they were 'inconsistent with the overall evidence of record.'" *Id.* Despite the apparent lack of explanation in the ALJ's decision, the *Smith* upheld the decision, finding that because the doctors based their opinions on Smith's self-reporting of symptoms and because the ALJ found elsewhere that Smith was not credible, inconsistency was "a factual determination within [the ALJ's] discretion under § 404.1527(d)(2)." *Id.* This factor distinguishes *Smith* from the present case, however, as Dr. Braman's opinion was not based solely on Ms. Bartolome's self-reporting. Thus, the *Rogers'* precedent adheres more closely to this case.

The ALJ's decision here provides no more detail than the decision rejected in *Rogers*. The ALJ here stated that the "medical record" did not support Dr. Braman's opinion, whereas the *Rogers* ALJ referred to "the record" in light of the appropriate regulation. Simply limiting the scope of relevant evidence to the "medical" record, rather than the record as a whole, does not constitute "specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record," and it does not "make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5. The ALJ's decision was therefore insufficiently supported.

Further, regardless of whether the ALJ was required to cite to particular evidence supporting his decision not to grant Dr. Braman's opinion controlling weight, he erred by failing to discuss just how much weight he did give to Dr. Braman's opinion. The Sixth Circuit held in *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 408 (6th Cir. 2009), that an ALJ decision is reversibly deficient when it rejects a treating doctor's medical opinion without explaining just how much weight that opinion

12

is due. *Id.* The court noted Social Security Rule 96-2p, confirming that "'[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected.'" *Id.* (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4). An ALJ's decision not to accord controlling weight to a treating source's opinion does not end its inquiry: "'Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927.'" *Id.* (quoting Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *4). Therefore, the court found that "the ALJ's summary rejection of Dr. Kibler without explaining the weight given his opinions falls short of the Agency's own procedural requirements." *Id.*

The ALJ's decision here did not apply the Section 404.1527(d)(2) factors to Dr. Braman's opinion, either explicitly or implicitly. The decision is silent regarding the details of Dr. Braman's treatment relationship with Ms. Bartolome: the length of the relationship; the frequency of examination; and the nature and extent of the relationship. It does not inquire into the evidence supporting Dr. Braman's opinion or the doctor's area of specialization. Nor does the decision discuss a conclusion—just how much weight short of "controlling" the ALJ gave to Dr. Braman's opinion. It only rejects his "conclusion that the claimant could not perform at least simple sedentary work on a full time regular basis," with no further discussion. This bare conclusion fails to meet the agency's promise that its decisions will "contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record," and will be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. Rul. 96-2p, 1996 WL 374188, at *5.

13

This does not end our discussion, however.  If the ALJ's violation can be deemed to have been only "harmless error," it may not require reversal.  The *Wilson* court, in leaving open this possibility, listed three potential types of harmless error: where the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it"; where the ALJ adopts the opinion of the treating source or makes findings consistent with it; and where the ALJ's analysis nonetheless meets the goal of § 404.1527(d)(2) by providing adequate explanation through other means.  *Wilson*, 378 F.3d at 547.

The first type of harmless error does not apply here.  Dr. Braman appears to have seen Ms. Bartolome regularly and based his opinion on that relationship.  Further, it is undisputed that for a number of years after her surgery, Ms. Bartolome was restricted from full-time work, which coincides with Dr. Braman's (admittedly, later) opinion.  Though Dr. Braman went further than the ALJ, who found that Ms. Bartolome could perform sedentary work at best, their conclusions differ more in magnitude than in kind.  Though Dr. Braman's opinion is somewhat conclusory, it is not so contradictory to the evidence on record as to be "so patently deficient that the Commissioner could not possibly credit it."[1]  *Id.*

The second example of harmless error is clearly inapplicable here.  The ALJ did not adopt Dr. Braman's opinion or make findings consistent with his conclusion.

The third type of harmless error needs more explanation.  The Circuit discussed this type of error in *Hall v. Comm'r of Soc. Sec.*, 148 Fed. App'x 456 (6th Cir. 2005).  The ALJ in *Hall* had failed, over two separate decisions, to explain the weight given to the opinions of Dr. Caudill, a

---

[1]     This is not to say that Dr. Braman's opinion is binding on the ALJ.  In light of its holding today, the court declines to address that issue here.

treating doctor. *Id.* at 458–59, 463.  Despite this failure, the *Hall* court applied the third type of harmless-error analysis, stating that the ALJ nonetheless "could have met the goal of providing good reasons [for dismissing the medical opinion of Dr. Caudill regarding the claimant's back ailment] by either his analysis of Dr. Caudill's other opinions or his analysis of Hall's back problems in general." *Id.* at 464.  That is, the ALJ could "indirectly attack[] the 'supportability' of the doctor's opinion, § 404.1527(d)(3), or the 'consistency' of his opinion with the record as a whole, § 404.1527(d)(4)." *Id.* (noting that key question is whether decision "implicitly provides sufficient reasons for the rejection . . . not merely whether it indicates that the ALJ did reject [the doctor's] opinion.").  Situations where the ALJ's analysis indirectly satisfies the purpose of Section 404.1527(d)(2) will be rare.  *See Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 462, 472 (6th Cir. 2006) ("We take the opportunity to note, however, that this is a rare case of the ALJ's analysis meeting the goal of the rule even if not meeting its letter.").  Nonetheless, such situations do exist. In *Hickey-Haynes v. Barnhart*, 116 Fed. App'x 718 (6th Cir. 2004), the court found that a failure to "label the amount of weight given to each treating physician's view or list the factors in 20 C.F.R. § 404.1527(d) to explain that conclusion" did not doom the ALJ's decision.  *Id.* at 725.  The ALJ's opinion, however, "show[ed] familiarity with the regulatory framework by emphasizing" the opinion of Bashir, "a specialist who treated Hickey Haynes for a long period of time" and whose "opinion was consistent with other record evidence." *Id.*  The ALJ's decision also clearly showed where the ALJ relied on each opinion, "factor[ing] the views of Drs. Varner and Pietrus into her RFC findings." *Id.*  In sum, the court found that "[e]ven assuming, for the sake of argument, that the ALJ did not technically meet the procedural requirement to give 'good reasons,' this was harmless error; the reasoning behind her use of each physician's opinion is clear." *Id.*

15

This is not the "rare case" that can find harmless error based on the ALJ's surrounding discussion. *Nelson v. Comm'r of Soc. Sec.*, 195 Fed. App'x 462, 472 (6th Cir. 2006). A close look at the ALJ's decision shows that this case does not rise to the *Hickey-Haynes* standard. As noted above, the ALJ found that "the medical records do not support" Dr. Braman's conclusion. (A.R. 17.) The decision does discuss in a later section various evidence that Ms. Bartolome could perform some of the activities of daily life and handle some jobs. (*See* A.R. 20–21 (noting Ms. Bartolome's testimony regarding her day-to-day activities, the fact that she worked for six years between her surgery and first disability claim, and other physicians' opinions regarding her functionality).) This evidence does not come from Ms. Bartolome's medical records, however—even the physicians' opinions are presented only as conclusions, without supporting medical data—and therefore this discussion does not explain the ALJ's rejection of Dr. Braman's opinion. The ALJ's discussion of Dr. McKay's opinion (discussed in more detail below) suggests familiarity with the regulatory framework, as the ALJ notes that Dr. McKay "saw the claimant only six to ten times in an eight month period, and gave her opinion several months after last seeing the claimant." (A.R. 18.) But whereas the ALJ's analysis in *Hickey-Haynes* provided an implicit comparison with the rejected doctors' opinions—his reasons to accept one opinion were equivalent to reasons for rejecting opposing opinions—this analysis provides no implicit comparison with Dr. Braman's opinion. For one, Dr. McKay's opinion was also rejected, and in any case it involved different issues than Dr. Braman's opinion. Further, the reasons given for rejecting Dr. McKay's opinion would not necessarily apply to Dr. Braman, as he appears to have seen Ms. Bartolome more times and over a longer period than Dr. McKay. In short, the ALJ's decision, even taken as a whole, simply does not shed enough light on his rejection of Dr. Braman's opinion to "permit[] meaningful review of the

ALJ's application of" the treating physician rule. *Wilson*, 378 F.3d at 544–45. It thus must be overturned.

Because the court finds that the ALJ's opinion did not provide enough detail to allow meaningful review of his treatment of Dr. Braman's opinion, the court cannot now address Ms. Bartolome's second and third grounds for this objection.

### B. *Plaintiff's Psychological Impairments*

Plaintiff next objects that the ALJ erred by failing to include Ms. Bartolome's psychological limitations in the hypothetical question posed to the vocational expert. She again argues several bases for this objection. She argues first that the ALJ improperly rejected Dr. McKay's opinion under the treating physician rule, as the opinion was "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence" and thus should be considered controlling. 20 C.F.R. § 404.1527(d)(2). Following from this, Ms. Bartolome argues that because Dr. McKay's opinion should have been accepted, the ALJ erred by ignoring her psychological limitations in posing the hypothetical question to the vocational expert. Finally, Ms. Bartolome argues that even without proper consideration of Dr. McKay's opinion, "[t]he ALJ *himself* found that Plaintiff suffered from adjustment disorder, which he found was a 'severe' impairment," and so the ALJ's failure to include this impairment in the hypothetical question posed to the vocational expert was error. Ms. Bartolome objects to the magistrate judge's rejection of these grounds.

These objections are OVERRULED.

Ms. Bartolome is correct that VE testimony based on an inaccurate hypothetical question cannot adequately support an ALJ's decision. *See White v. Comm'r of Soc. Sec.*, 312 Fed. App'x

17

779, 789 (6th Cir. 2009) ("Because the hypothetical question simply restates the RFC, and because, as discussed above, the RFC does not accurately portray White's limitations, . . . the ALJ erred in relying on the answer to this question."); *Reed v. Sec'y of Health & Human Servs.*, 804 F. Supp. 914, 925 (E.D. Mich. 1992).  But to the extent that Ms. Bartolome claims that a proper hypothetical question must name each of her "severe" medical conditions, she is wrong.  The law of this circuit holds that the hypothetical question does not need to list each severe impairment by name, so long as it accounts for all functional limitations related to such impairments.  *See Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (holding that hypothetical question is not required "to include lists of claimants' medical conditions"); *Lusk v. Comm'r of Soc. Sec.*, 106 Fed. App'x 405, 411–12 (6th Cir. 2004) (upholding ALJ decision where hypothetical question accounted for medical condition implicitly).  Ms. Bartolome quotes from *Reed v. Sec'y of Health & Human Servs.*, 804 F. Supp. 914, 925 (E.D. Mich. 1992): "A hypothetical question to a VE may omit nonsevere impairment[s] but must include those which the ALJ finds to be severe."  *Id.*  But this case does not control over the circuit court's later holdings, and in any case, the *Reed* opinion itself looked to the symptoms listed in the hypothetical, rather than the specific impairments named: "The hypothetical used in this case failed to satisfy this standard because it did not include ***symptoms of*** plaintiff's Chronic Fatigue Syndrome."  *Id.* (emphasis added).

Thus, the question here is whether the ALJ's hypothetical improperly omitted any of Ms. Bartolome's functional limitations, whether they stem directly from Dr. McKay's medical opinion (assuming that the ALJ was required to accept it), or instead from the severe adjustment disorder that the ALJ found Ms. Bartolome to suffer from.

Dr. McKay opined that Ms. Bartolome had "poor to no ability to deal with the public and

deal with work stresses," "a fair to poor ability to follow work rules and relate to co-workers," and "a fair ability to interact with supervisors, function independently, maintain attention/concentration, deal with changes in a work setting, and understand, remember and carry out any type of instructions."  (A.R. 18 (ALJ's summary of Dr. McKay's opinion).)  The ALJ rejected these conclusions, pointing to the fact that "the claimant worked for six years after her impairment resulting surgery; and is able to function independently, relate well to friends and family, handle her own finances, leave home alone, drive, do minor household chores, and go shopping."  (A.R. 18.)  Ms. Bartolome argues that the ALJ cannot reject Dr. McKay's opinion on these grounds.  Because the ALJ's stated reasons do not "negate the fact that McKay's disability opinions were supported by a medically acceptable *diagnosis*," and because Dr. McKay's conclusions spring from this well-supported diagnosis, the doctor's conclusions are themselves binding, she argues.

This argument misunderstands the relevant law.  The regulation establishing the treating-physician rule states that a treating doctor's opinion is binding when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques ***and*** is not inconsistent with the other substantial evidence."  20 C.F.R. § 404.1527(d)(2) (emphasis added).  Both requirements must be true to make the opinion binding; that is, the ALJ can reject the opinion if he finds ***either*** that it is not well-supported ***or*** that it is inconsistent.

Here, the ALJ found the opinion inconsistent with other substantial evidence in the record.  Specifically, he pointed to evidence that "the claimant worked for six years after her impairment resulting surgery[] and is able to function independently, relate well to friends and family, handle her own finances, leave home alone, drive, do minor household chores, and go shopping."  (A.R. 18.)  This evidence contradicted Dr. McKay's opinions that Ms. Bartolome "had a poor to no ability

to deal with the public and deal with work stresses"; "a fair to poor ability to follow work rules and relate to co-workers"; and "a fair ability to interact with supervisors, function independently, maintain attention/concentration, deal with changes in a work setting, and understand, remember and carry out any type of instructions."  (A.R. 18 (ALJ's summary of Dr. McKay's conclusions); *see* A.R. 669–70.)  The ALJ described this evidence in more detail at other points in the decision. (*See, e.g.*, A.R. 15, 19–21.)

The ALJ has pointed to sufficient evidence to support his decision.  A reasonable decision-maker could accept this evidence as adequate to contradict Dr. McKay's opinion, and so this court may not disturb the ALJ's decision on this point.  *See Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994) ("Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.").  Though Ms. Bartolome points to other evidence in the record that supports Dr. McKay's findings, this is not relevant to the court's decision.  Where the ALJ's decision is supported by substantial evidence, this court must affirm, even if substantial evidence also supports the opposite conclusion.  *See Smith v. Chater*, 99 F.3d 780, 781–82 (6th Cir. 1996).

Because the ALJ was not required to give Dr. McKay's opinion controlling weight, Ms. Bartolome's objection is OVERRULED to the extent that it is based on this argument.

The ALJ did not entirely reject Dr. McKay's opinion, however.  As Ms. Bartolome points out, the ALJ did find that she suffers from "severe . . . adjustment disorder," following Dr. McKay's diagnosis.  (*See* A.R. 14.)  Ms. Bartolome argues that having made this finding, the ALJ was required to account for this disorder in his hypothetical question.  Having failed to do so, his opinion must be reversed.

20

This objection is also OVERRULED. Ms. Bartolome does not specify just which psychological limitations she claims arise from adjustment disorder, but presumably she means to include at least some of the things discussed in Dr. McKay's opinion. Certainly, the ALJ did not specifically mention Ms. Bartolome's adjustment disorder in his hypothetical, but this does not mean that he failed to account for her psychological limitations. An ALJ can account for limitations through the restrictions he puts into the hypothetical question. *See Lusk v. Comm'r of Soc. Sec.*, 106 Fed. App'x 405, 411–12 (6th Cir. 2004) (upholding ALJ decision where hypothetical question "did not explicitly name reactive depression as a limitation, [but] did include a restriction requiring 'low stress work with limited interaction with co-workers, supervisors, or the general public'").

In this case, Dr. McKay's questionnaires and letter state that Ms. Bartolome's psychological problems are largely attributable to her communication problems—that is, though she has no cognitive or intellectual limitations, "her physical impairments do have psychological consequences." (A.R. 668.) Similarly, much of Dr. McKay's opinion was based on her belief that it would be "incredibly unrealistic" for a workplace to accommodate Ms. Bartolome's communications problems. (A.R. 667–68.) That is, Ms. Bartolome's psychological and physical limitations were not independent; instead, the psychological limitations arose from the physical ones, and properly accounting for Ms. Bartolome's physical limitations would thus minimize her psychological limitations as well. Because the ALJ included Ms. Bartolome's physical limitations in the hypothetical—severely limiting the amount of physical activity, noting that she is "limited by weakness of speech or vocal weakness," and requiring that she need to speak only "short sentences [in] very quiet environments with no background noises" (A.R. 59)—he can properly be said to be accounting for her psychological limitations as well. Therefore, the hypothetical question to the VE

21

properly accounted for Ms. Bartolome's psychological limitations.

C.      *Plaintiff's Credibility*

Finally, Ms. Bartolome objects to the ALJ's finding that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with" the ALJ's residual functional capacity determination. (A.R. 20.)

These objections are OVERRULED.  I will discuss each of Ms. Bartolome's four arguments in turn.

First, Ms. Bartolome argues that the ALJ's opinion should be rejected because it contained only "a conclusory, boilerplate statement" regarding her lack of credibility.  This argument lacks merit.  It is clear from the ALJ's discussion that he rejected Ms. Bartolome's testimony to the extent that it exceeded his determination of her residual functional capacity.  The ALJ need not "identify . . . particular statements of Plaintiff[] that he rejected," as Ms. Bartolome claims.  In any case, the ALJ's determination was adequately supported, as the magistrate judge properly found.  It is true that an ALJ is required to "explain his credibility determinations in his decision such that it 'must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight,'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (quoting Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *2–3 (July 2, 1996)), but the ALJ here did describe his decision with sufficient specificity.  Ms. Bartolome admits that the ALJ discussed in some detail "Plaintiff's reports to SSA"; "Plaintiff's trial testimony"; and the opinions of treating physicians.  Much of this evidence contradicts the more serious of Ms. Bartolome's claims.  As the ALJ noted, Ms. Bartolome had worked for a number of years after her surgery—first four days a week, then full-time after Dr.

22

Bastian, her treating specialist, cleared her for it.  (Dr. Bastian did later opine that Ms. Bartolome could no longer perform her customer-service job (A.R. 540), but he did not claim that she was not able to perform other jobs with proper accommodation.)  Even after her disability claim, Ms. Bartolome was able to perform a number of daily activities, though in a limited capacity.  The ALJ also noted Ms. Bartolome's demeanor and testimony at the hearing, during which she "spoke in complete sentences and her speech was easily understood," though "[a]t times the claimant wheezed on inspiration."  (A.R. 21.)  Finally, the ALJ discussed the statements of various doctors, including Dr. Bastian, who reported even after Ms. Bartolome applied for disability that her voice, though weak, was functional.  Two other doctors, Dr. Hernandez and Dr. Mulder, also saw Ms. Bartolome and submitted reports that the ALJ considered in his decision.  This discussion is more than sufficient to allow review of the ALJ's decision, *see Rogers*, 486 F.3d at 248, and Ms. Bartolome's objection is thus OVERRULED to this extent.

Second, Ms. Bartolome argues that the magistrate and/or the ALJ improperly relied on her "demeanor while testifying" to uphold the adverse credibility determination.  This argument also fails.  ALJs are generally discouraged from making lay diagnoses from the bench.  As other courts have noted, this practice harms honest claimants and creates incentives for dishonest ones to play up their injuries, and the reliability of such findings is uncertain at best.  *See, e.g.*, *Garland v. Sec'y of Health & Human Servs.*, 528 F. Supp. 415, 416–17 (E.D. Mich. 1981).  But personal observations do not always amount to a lay diagnosis, and the courts have taken issue with such reliance mostly where the ALJ uses his observations to contradict the entirety of the evidence on record.  Where instead the ALJ's personal observations supplement other record evidence, they may be considered a proper part of the determination.  *Compare Moon v. Sullivan*, 923 F.2d 1175, 1182–83 (6th Cir.

1990) ("[T]he ALJ may distrust a claimant's allegations of disabling symptomatology if the subjective allegations, the ALJ's personal observations, and the objective medical evidence contradict each other."), *and Lucido v. Comm'r of Soc. Sec.*, 109 Fed. App'x 715, 716–17 (6th Cir. 2004) (upholding ALJ's adverse credibility determination where his personal observations matched other support in record), *with Weaver v. Sec'y of Health & Human Servs.*, 722 F.2d 310, 312 (6th Cir. 1983) ("[W]e cannot allow the dismissal of a claim for pain *solely* on the ALJ's observations at the hearing." (emphasis added)).  Here, as noted above, the ALJ did not rely *solely* on his personal observations to contradict the evidence on record.  Instead, the ALJ's personal observations coincide with the opinions of treating and nontreating doctors and with Plaintiff's own statements about her physical activity, and so his reference to such observations is not reversible error here.

Third, Ms. Bartolome argues that the ALJ improperly used her prior work history—specifically, the fact that she worked for six years between her goiter surgery and her disability claim—to find her testimony not credible.  While it is true that past work may not have much relevance to a claim of present disability, this court is not prepared to say that it is entirely irrelevant to the issue, particularly where, as here, the work was performed under the same physical problem that forms the basis of the current claim.  *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) ("The claimant's work history and the absence of objective medical evidence to support the claimant's complaints are also relevant [to claimant's credibility].").  In any case, however, Ms. Bartolome's work history is not the only pillar supporting the ALJ's decision, and even without it, the conclusion stands.

Finally, Ms. Bartolome argues that the ALJ did not have the discretion to find her testimony not credible when it was not contradicted by any other testimony or evidence.  But as discussed in

the rest of this section, Ms. Bartolome's testimony was in fact contradicted by significant other evidence in the record.  Her own treating specialist cleared her for work prior to her disability claim and reported afterward that Ms. Bartolome's voice was functional, though weak.  The other medical opinions, including those of Dr. Mulder and Dr. Bastian, contradicted her most serious claims.  Ms. Bartolome's own testimony established that she had at least some ability to perform everyday activities, and the ALJ's personal observations supplemented these sources of evidence.

Ms. Bartolome argues that her testimony coincided with other record testimony at a number of points.  But this does not negate the inconsistencies found by the ALJ.  The issue here is not whether some evidence supports Ms. Bartolome's testimony, but whether the evidence as a whole contradicts it—and more to the point, whether the evidence as a whole provides "substantial evidence" to support the ALJ's finding.  It does, and as such, the ALJ's determination will not be disturbed on this point.

## IV.  CONCLUSION

As this case demonstrates, the issue of whether an ALJ has provided sufficient explanation to support his decision is often a difficult question.  Though this court is bound to give an ALJ's findings significant respect, this deference is not absolute, and the ALJ's opinion must show enough of his thinking to allow the courts to ensure that the ALJ properly followed the law and that his findings are based in substantial evidence.  *See Wilson*, 378 F.3d at 544–45.  Though much of the decision at issue today does provide adequate reasoning, at least when read in context, to support the ALJ's determinations, I cannot find that the ALJ satisfied his obligation in rejecting Dr. Braman's medical opinion.  The decision is simply too vague on this point to permit meaningful review of the ALJ's application of the treating physician rule.  I therefore must remand to the

25

Commissioner for further proceedings.

## ORDER

For the reasons discussed above, **IT IS HEREBY ORDERED** that:

1.      The report and recommendation (ECF No. 11) is **REJECTED**; and

2.      The Commissioner's decision is **REMANDED** for further proceedings consistent with this opinion.

**IT IS SO ORDERED.**

Date:   November 28, 2011                             /s/ Paul L. Maloney
                                                     Paul L. Maloney
                                                     Chief United States District Judge

26